# Exhibit E

Page 10

A. Yes, we came back decorated, yes.
Q. What decorations did you get?
A. Unfortunately it's something I can't go into due to operational security.
Q. Very well. When were you discharged from the army?
A. 2014.
Q. Were you honorably discharged?
A. Yes.
Q. Were you studying online while you were in the army?
A. Yes, I was.
Q. What was your degree in?
A. Environmental safety, security and technology.
Q. Environmental?
A. Safety, security and technology.
Q. Did you follow-up after your associates degree with any education?
A. No.
Q. How long have you been a member of the Asbury Park Police Department?
A. Approximately six and a half years.
Q. What year did you begin?
A. 2014 as a Class II.

Page 11

Q. Class II in Asbury Park?
A. Yes.
Q. Did you ever work in any other police departments?
A. Yes.
Q. Where?
A. Wildwood Crest.
Q. When did you do that?
A. Six months prior to Asbury Park.
Q. How long did you work there?
A. One summer.
Q. What summer was that?
A. The summer of 2014.
Q. Where did you attended the academy?
A. Cape May County Police Academy.
Q. Who sponsored you for that?
A. Wildwood Crest.
Q. When did you enter the academy, and when did you graduate?
A. I believe it was May 2nd, and we graduated July 3rd.
Q. A one-month academy?
A. It was about two months. It's accelerated in Cape May. We did six days a week.

Page 12

Q. And did you graduate from the Cape May County Police Academy?
A. Yes, I did.
Q. Where did you finish in your class?
A. Top 15.
Q. Top 15. Do you know the exact number?
A. Not off the top of my head, no. Our class was approximately 98 people.
Q. 15 out of 98 -- top 15 out of 98. Did they teach you use of -- I'm sorry, let me rephrase it.
Did you receive use of force training at the Cape May Academy?
A. Yes.
Q. Did they teach you about use of force?
A. Yes.
Q. Did they teach you how to use force?
A. Yes, they did.
Q. Did they teach you when to use force?
A. Yes.

Page 13

Q. Did they teach you what kind of force you could use?
A. Yes.
Q. Did they teach you what the different levels of force are?
A. Yes.
Q. Can you tell us what the different levels of force are?
A. There's hands-on force, mechanical force, physical force, and there's deadly force.
Q. Hands-on, physical?
A. Correct, mechanical.
Q. Mechanical?
A. And deadly force.
Q. Deadly. That's the way they taught it to you?
A. Not in that order, no.
Q. All right. But those were the terms that they used for the different levels of force? Hands-on, physical, mechanical and deadly?
A. Correct.
Q. All right. And did they teach you that as a police officer you're only allowed to -- you're only permitted to use reasonable force under the circumstances?

Page 14

A. We're taught to achieve the law enforcement objective. You use the least amount of force necessary at the given time.
Q. Did they teach you that you're not permitted to use excessive force?
A. Correct, we don't use excessive force.
Q. Did they teach you what excessive force is?
A. Yes.
Q. What is excessive force?
A. Excessive force is any force deemed excessive of the law enforcement objective.
Q. Well, you used the word excessive in your definition. So any force that's deemed excessive, what do you mean by that?
A. Any force that is escalated to an unnecessary level of force to achieve the objective.
Q. All right. Have you had any complaints filed against you as an Asbury Park police officer?
A. Yes.
Q. How many?
A. I don't recall.
Q. Have you had any complaints filed

Page 15

against you for excessive force?
A. Yes.
Q. Besides this?
A. Yes.
Q. How many have there been?
A. I don't have an exact number for you. Sorry.
Q. Have any resulted in findings that were sustained?
A. No.
Q. Hold on one second.
Okay. Mr. Thomas, I'm having --
MR. MALLON: Mr. Seijas, I'm having my assistant look into the IA records that we were supplied. I'm not familiar with any complaints of excessive force.
MR. SEIJAS: Other than the instant one, I'm not either. I don't know if there was one after this incident. That's the best I can tell you. I can get you -- all I have is the sheet I gave you.
MR. MALLON: All right. Let me ask Mr. Thomas more questions.
MR. SEIJAS: Okay.
BY MR. MALLON:

Page 16

Q. Mr. Thomas, you say you don't know how many prior excessive force complaints have been made against you?
A. Correct.
Q. Has it been more than one?
A. Yes.
Q. And these were complaints that were made to -- Internal Affairs complaints?
A. Yes.
Q. And these complaints took place before this incident involving Mr. Acerra?
A. Yes.
Q. And it was more than one?
A. To my -- if I had to guess, yes.
Q. And have there been any Internal Affairs complaints against you for excessive force since this incident with Mr. Acerra, after November 23rd, 2017?
A. Yes.
Q. How many?
A. I do not recall.
Q. All right. In all of these cases where complaints have been made against you for excessive force, were the results -- what were the results?

Page 17

A. Exonerated.
Q. Can you give us some of the names of the people that made complaints against you?
A. I do not recall their names.
Q. Did any of these cases result in other lawsuits being filed against you?
A. No.
Q. Have you ever been sued other than this case as a police officer in Asbury Park before or after this?
A. No, I have not.
Q. So this is the only time you've ever been the subject of a lawsuit as a police officer in Asbury Park?
A. Correct.
Q. Have you received any notices of potential claims from any of these other people who made Internal Affairs complaints for excessive force?
A. No, I have not.
Q. I'm going to ask you -- one other instruction. Sometimes we can ask you to approximate distance, time or in this case, I'm going to ask you to approximate the number of excessive force complaints that have been brought

Q. And again, he didn't pull you, but it was the fact that you weren't letting go of his wrist that pulled you to the ground?
A. Correct.
Q. And he tripped somehow over his own feet?
A. Well, I believe he tripped due to him trying to jerk his hand away from my control, and he tripped over his own feet, yes.
Q. Okay. And then fell backwards?
A. Correct.
Q. With you on top. What happened then?
A. Then myself and the other officers placed him into handcuffs behind his back for disorderly conduct.
Q. Did you have to struggle with him at all after he was on the ground?
A. No.
Q. At what point did you tell him, if any, that he was under arrest?
A. After we both fell to the ground.
Q. Did anybody assist you in cuffing him after the two of you went to the ground?
A. Yes, the two officers that were



assisting me.
Q. And their names again?
A. Vasta and Griffith.
Q. Okay. Did you prepare a use of force report?
A. No, I did not.
Q. Why didn't you?
A. Because I didn't use force on him.
Q. You grabbed ahold of his wrist; did you not?
A. I controlled his wrist, correct.
Q. All right. Is that physical force?
A. I didn't use force on him, no.
Q. Okay. But when he tried to pull away, you didn't let go?
A. Correct. I did not let go.
Q. And so after he hit the ground, did you turn him over, or how did you cuff him when he was face up?
A. He was rolled over.
Q. Who rolled him over?
A. Myself.
Q. Just yourself?
A. Well, I was on top of him. Once he hit



the ground, he did not fight. That's why he was not charged with resisting arrest.
Q. Did you use your knees at all?
A. I did not.
Q. Did you punch him?
A. No.
Q. Did you kick him?
A. Absolutely not.
Q. And you didn't use your knee in any way to turn him over?
A. I did not. He was completely compliant once we hit the ground.
Q. He was completely compliant after he fell to the ground; correct?
A. Correct.
Q. And did he sustain any injuries in this fall to the ground?
MR. SEIJAS: Object to the form of the question. You can answer.
THE WITNESS: Not that I recall.
BY MR. MALLON:
Q. Did he sustain any injuries after he fell to the ground?
MR. SEIJAS: Object to the form of the question. You can answer.



THE WITNESS: The only thing I saw was a minor scuff on his arm.
BY MR. MALLON:
Q. Where on his arm?
A. The forearm area.
Q. Let my ask you this: In any of these other eight cases involving excessive force complaints brought against you, did any of these other individuals maintain a bladed stance causing you to grab them the same as Mr. Acerra?
MR. SEIJAS: Object to the form of the question. You can answer.
THE WITNESS: I do not recall.
BY MR. MALLON:
Q. If we get ahold of those records and those police reports, are we going to see that any of these other individuals were taking a bladed position, similar to the one you described here?
A. I'm sorry, can you ask that again?
Q. Have you had other cases where people -- where you used the same language in the report, as you have here, where somebody took a bladed stance prior to you making an arrest?
MR. SEIJAS: Object to the form of the question. You can answer.

# Exhibit F

# ASBURY PARK POLICE DEPARTMENT

## MEMO

**To: Internal Affairs officer Frank Sangi #230**

**From: Patrolman Richard Thomas #266**

**Date: 03/26/2018**

**Subject: IA-18AP04864**

**CC:**

---

On Wednesday November 23rd 2017, I, PO. R. Thomas #266 was assigned to an outside employment detail located at 911 Kingsley Street (Porta Night club). At approximately 01:09 hours a subject, later identified as Thomas Acerra was ejected from the club for improper behavior deemed by the staff of the facility.

Acerra was intoxicated and continually argued with the staff at the front entrance of Porta and repeatedly attempted to get back inside. At this time, myself and SO. Griffeth #931 approached Acerra and asked him to leave the property and/or go to a different establishment for the remainder of the evening. Acerra continually disregarded our pleads to leave the area and at this point myself and SO. Griffeth managed to escort Acerra from the area of the front door to the Southwest corner of Kingsley Street and Second Avenue. Once at this location we continue to plea with Acerra to leave the location, which at this particular time Acerra became belligerent. While Acerra was being verbally abusive to myself and SO. Griffeth, he took an aggressive stance by widening his feet to approximately should width apart with his right light slightly towards the rear and placed his hands in the "low ready" with his fists balled up in the area of his waist band. It appeared as if Acerra was preparing to attack myself and SO. Griffeth. Upon my observations of Acerra's body language, I took control of his right arm with both of my hands, however due to the level of his intoxication Acerra lost his footing and myself and Acerra fell to the ground. At this juncture I told Acerra in a commanding voice that he was under arrest and for him not to fight. It should be noted that once both myself and Acerra were on the ground, Acerra did not resist, attempt to fight any officers affecting the arrest, and relinquished his hands from a balled state to open palms. Acerra was placed into handcuffs behind his back and double locked to ensure proper fit. Acerra was then placed into a marked patrol vehicle and transported to police headquarters for

processing. I observed a small abrasion to the forearm of Acerra from falling to ground and asked him if he wanted medical attention, in which he replied no. At no point doing this altercation did Acerra's head hit the ground and no injuries were observed by myself reflecting the same. It should be further noted that during this event taking place, numerous "shots fired" calls were being reported in the city, which subsequently evolved into an active homicide investigation. See 17AP32188.

I advised SO. Griffeth and SO. Vasta to transport Acerra to police headquarters for booking being that the city was being plagued with multiple calls for service and an ongoing homicide investigation/scene. Both SO. Griffeth and SO. Vasta transported Acerra to headquarters and transferred him over to a processing officer and returned to their post immediately. It should be noted that this event was not captured on my body worn camera, which I had with me at the time, however, was inside of the patrol vehicle being charged due to it dying previously in the night.

Patrolman Richard Thomas #266

# Exhibit G

MR. FITZSIMMONS: No problem.
Q. Can you see this screen okay?
A. Yes.
Q. Okay. So this is the Asbury Park Police Department Standard Operating Procedure for Body Worn Cameras. So you can see the effective date was October 6, 2016.
Under Incidents to Record, number 12 says, When an officer uses constructive authority or force, or reasonably believes that constructive authority or force may be used in any encounter or situation not otherwise listed in the subsection based on specific and articulable facts warranting heightened caution.
Okay. So it's safe to say that when an officer is using constructive authority they have the duty to activate their body worn camera; correct?
A. Correct.
Q. And you had just previously stated that telling an individual to leave the premises of Porta would be an example of constructive authority; is that correct?
A. Correct.
Q. So it's safe to say that on this night on the date of the incident when police officers told Mr. Acerra to leave the premises, a body camera should have been activate?



A. Right.
MR. SEIJAS: Object to the form of the question.
You can answer.
A. Correct.
Q. Do you remember activating your own body camera?
A. I --
MR. SEIJAS: Object to the form of the question.
You can answer.
A. I do not recall.
Q. Who were the other officers assigned to Porta with you?
A. I believe that night it was myself, Officer Thomas, Officer Griffeth and Officer Dowling.
Q. Had you previously worked with these officers at Porta before?
A. I have.
Q. And where were you stationed outside of Porta?
A. I believe I was -- at the entrance of the nightclub is usually where we were.



Q. And what street is that on?
A. Kingsley and Second.
Q. Is that where all of the aforementioned officers were standing?
A. Normally that is where we all stand. It's the entrance to the nightclub.
Q. Do you remember what time it was when you first observed Mr. Acerra?
A. I do not.
Q. Do you remember the manner in which Mr. Acerra exited the bar?
A. I do not.
Q. Do you remember any bouncers or security physically removing him from the bar?
A. I do not.
Q. So it's safe to say you don't remember if he was physically removed or if he left on his own accord?
A. I don't remember.
Q. Do you remember if it was cold out that night?
A. I don't recall.
Q. Do you remember Mr. Acerra saying anything to any police officers?
A. I do not recall.



Q. Do you have any recollection of yourself speaking with Mr. Acerra?
A. I do not.
Q. After Mr. Acerra was removed from the bar what happened next?
A. I don't recall.
Q. Do you recall yourself or any other officer telling Mr. Acerra to leave the property?
A. I do not.
Q. And I know you're a busy police officer. In general, do you remember a lot about incidents that happened or does that tend to blend together?
A. Instances from four years ago tend to blend.
Q. What was the -- strike that.
In your experience working outside of Porta, the individuals that were physically removed from the bar, what was their general demeanor?
A. Usually aggressive.
Q. Drunk?
A. Yes.
Q. Do you remember Mr. Acerra being either of those things that night?
A. I do not.
Q. Do you remember any threats being made

that night?
A. Do not recall.
Q. If an individual fails to obey a police command what is the usual next step?
A. I'm sorry, can you say that again?
Q. Let me rephrase that. If you were working outside of Porta and you told an individual to leave the premises and they refused, what is usually the next step of action?
A. I would give them one more option to leave. If they did not leave they would be arrested.
Q. If they refused to leave multiple times would you document it with your body worn camera?
A. Yes.
Q. Is there any reason why a police officer in that situation would not activate their body worn camera?
A. If the situation was expedited and there wasn't the option or the opportunity to turn it on fast enough. If, you know, something had to be done quickly and effectively.
Q. Do you remember Mr. Acerra falling to the ground the night of his arrest?
A. I do not.
Q. Do you remember any force being used on



Mr. Acerra?
A. I do not.
Q. Okay. I'm going to share my screen one more time.
MR. FITZSIMMONS: And, Counsel, this is the same one I previously showed before.
Q. Okay. Do you see the memo on the screen?
A. Yes.
Q. Okay. This memo was taken by Officer Thomas Dowling. I'm going to scroll down to the bottom where he states, Acerra began to start a brief struggle with officers which led to some force being used against him to arrest Acerra and the struggle fell into the street on the pavement.
Is it safe to say that there was some force used against Mr. Acerra that night?
A. According to this memo, yes.
Q. In your experience are police officer memos and reports accurate of what happened?
A. Yes.
Q. So it's safe to say this is an accurate report that some force was used on Mr. Acerra?
MR. SEIJAS: I just object to the form of the question.



You can answer.
A. Yeah.
Q. To your knowledge, who used force on Mr. Acerra?
A. Officer Thomas.
Q. So you do have some memory of what happened that night?
MR. SEIJAS: Object to the form of the question.
You can answer.
Are you asking him -- I mean, you just showed him a document that says that and you're asking him about that. And now you're trying to equate that to his recollection so --
MR. FITZSIMMONS: What I'm trying to do – he previously stated multiple times that he has no recollection of Mr. Acerra, but he just stated that he remembers that Officer Thomas used force.
MR. SEIJAS: He didn't say he remembered it. You asked him if he used force based upon what he just read and he said, yes.
MR. FITZSIMMONS: I asked him who used force. And in the report that I showed him it doesn't say anyone used force, it just says force was used.



MR. SEIJAS: Okay. All right. Well, I'm going to put my objection on the record.
MR. FITZSIMMONS: I understand. I understand.
MR. SEIJAS: You can answer.
A. I do not recall.
Q. This might be a difficult question to answer and I apologize if you can't. During the average month in your duties how often would you say you activate your body camera?
MR. SEIJAS: Just – now, at the --
MR. FITZSIMMONS: Yes.
MR. SEIJAS: -- Sheriff's Department?
MR. FITZSIMMONS: Now, yes.
A. Every law enforcement interaction I have with the public.
Q. Okay. Were you disciplined as a result of this incident?
A. I do not recall.
Q. Do you remember if any other officers were disciplined as a result of this incident?
A. I do not recall.
Q. What is a Detainee Screening Form?
A. I'm sorry, can you say that again?
Q. A Detainee Screening Form.

A. When an individual is arrested they're taken back to headquarters and processed. And that information is put on a Detainee Screening Form asking if they have any medical injuries or need an ambulance.
Q. Is this for the benefit of the individual or the police department?
A. It is to keep a record if there's any injuries.
Q. Do you remember what happened when Mr. Acerra was on the ground?
A. I do not.
Q. Do you remember Mr. Acerra resisting in any manner?
A. I do not.
Q. Do you remember Mr. Acerra making any sort of threats?
A. I do not.
Q. Do you remember if Mr. Acerra took an aggressive stance towards any police officer?
A. I do not.
Q. What time did your shift end that night?
A. I believe the overtime detail ended at 02:30 in the morning.
Q. Were you stationed at Porta the entire



night?
A. Yes.
Q. Okay. Do you remember who transported Mr. Acerra back to the police department?
A. I do not.
MR. FITZSIMMONS: All right. I have no further, questions.
MR. SEIJAS: I'm going to have some questions, but I just want to -- oh, there we go. I just have Scottie at my office -- I don't have a copy of the exhibits on me. Let me just ask a couple questions before I get into it.

CROSS EXAMINATION BY MR SEIJAS:
Q. Officer Vasta, you testified that you have no specific recollection of the events of November 23rd, 2017; correct?
A. Correct.
Q. Okay. You were essentially assigned outside of a nightclub to assist the nightclub with the guests that come in and out of the place; correct?
A. Correct.
Q. Okay. When a guest is thrown out of the place by the interior employees of the nightclub, are



they normally allowed back in?
A. No. Sorry, that's my dog.
Q. Okay. Now, you have worked the shift approximately a dozen times before; correct?
A. Correct.
Q. You have worked at other nightclubs in Asbury Park essentially doing these front door duties; correct?
A. Correct.
Q. I know you said about a dozen times at Porta. Is there a way you can estimate for me how many times you've done this in Asbury Park?
A. At Porta?
Q. I'm sorry?
A. Just at Porta?
Q. No. At any club in Asbury Park.
A. 2017, approximately maybe two dozen.
Q. Two dozen. Okay. And during these approximate two dozen times that you've worked the front door at nightclubs in Asbury Park, is it unusual for people to get ejected from these clubs by the interior staff?
A. No.
Q. It happens quite often; doesn't it?
A. Yes.



Q. In the occasions that it happens often, are these individuals normally intoxicated?
A. Yes.
Q. Okay. And at that point in time it's up to you or whichever Asbury Park police officer to help this intoxicated person to get away from the club; correct?
A. Correct.
Q. Is it safe to say that the nightclub owners do not want intoxicated people hanging out in front of their clubs?
A. Correct.
Q. Okay. Are these intoxicated people in your dozen or so times working the front door at these clubs at Asbury Park, are they quiet and well behaved?
A. Most of them are compliant. Others tend to be aggravated and agitated by the situation.
Q. Okay. And I understand that you have no specific recollection of the events that happened on November 23rd, 2017. I would like to show you a document that may help to refresh your recollection; okay?
A. Okay.
MR. SEIJAS: All right. Scottie, can

# Exhibit H

Q. Okay. Did they teach you when the use of force was necessary?
A. When -- they teach it when there's -- when the occasion arises. You know, it's not -- every case is a -- you're using force.
Q. Did they teach you what the different levels of force are?
A. I believe so.
Q. Could you explain the different levels of force?
A. What kind of force?
Q. That's precisely what I'm asking. What kind of force were you taught?
A. There's a couple. If I remember off the top of my head, it's been a while, there's constructive authority, there's verbal commands and using your hands. I can't remember the exact names of the -- the -- I can't remember the exact terms. It's been a while and I'm no longer with the department.
Q. When was the last year you worked as a police officer in any capacity?
A. I believe it was the beginning of 2019 or in 2019. I can't exactly remember.
Q. Were you ever hired as a full-time



police officer at any department?
A. No.
Q. You mentioned constructive force. Could you just kind of explain what that means?
A. Like, constructive authority, like – I don't want to give you the wrong definition but it's using the tools on your belt to construct and, like, show authority without using the tools on your belt to -- so -- so to say, persuade them to, you know, stop advancing towards you or -- really, just to – advancing towards you is constructive authority to, you know, guide someone to the ground with any of the tools on your belt without actually using the tools.
Q. Okay. So constructive authority is more verbal?
A. Yeah. But you can use the tools on your belt to help that with, you know, loud verbal commands.
Q. At the police academy were you taught what excessive force is?
A. Not to my knowledge. There was a lot of stuff we went over. We very well could have but I just don't remember.
Q. How would you define excessive force?
A. Going above and beyond what the



situation calls for. You know, going over your powers that you don't have to.
Q. Would you agree that if an officer did use excessive force on an individual that that would be a violation of that individual's Civil Rights?
MR. SEIJAS: Object to the form of the question.
You can answer.
A. Say it again.
Q. Would you agree that if an officer did use excessive force on an individual, that that would be a violation of that individual's Civil Rights?
MR. SEIJAS: Same objection.
You can answer.
A. I'm not sure about the Civil Rights.
Q. Okay.
A. Can't -- I don't want to give you, like, the wrong -- I don't know how to answer that question.
Q. If you don't know the answer to a question just simply say that you don't recall or you're not sure. I don't -- don't make any guesses. It's just to the best of your knowledge.
A. Mm-hmm.
MR. SEIJAS: That's a "yes"? Try not



to –
THE WITNESS: Yes.
MR. SEIJAS: -- say "mm-hmm" or "ut-huh" as well; okay?
THE WITNESS: Yes, sir.
Q. At the police academy did they teach you that a police officer has a duty to intervene if they observe another officer using excessive force?
A. Yes. They told us the – the correct way to go about things in the field if we notice something out of the ordinary.
Q. So would you agree that if an officer fails to intervene after observing another police officer using excessive force, that that would also be a violation of the individual's Civil Rights?
MR. SEIJAS: Object to the form of the question.
You can answer.
A. You can intervene, yes, do it -- do it the correct way, you know, the professional way to -- to intervene. Again, on the Civil Rights -- like I said, I'm not too sure of the whole Civil Rights. I mean, we could have learned that in the academy. I'm -- like I said, I don't remember that much in the academy through the training. It was four to five

Page 21

A. I believe it was 10:30 p.m.
Q. And what were your duties that night at Porta?
A. Usually when officers are hired for the security details at any bars in Asbury Park we provide security to the entrances. And being Porta, they have a few different entrances to enter the club, so we'll have a few officers -- excuse me -- we'll have a few officers stationed by the couple entrances and -- and just monitor the crowd and monitor the -- the large quantity of individuals that arrive to this nightclub.
Q. And what door were you stationed by this night?
A. I do not recall where I was standing. I'm not a hundred percent sure.
Q. Do you remember whether you were standing outside or whether you were in a police car?
A. I do not recall.
Q. Once you were issued a body worn camera, when were you required to wear it?
A. It was worn all -- like, during my shift.
Q. So if you were issued a body worn camera on November 23rd, 2017, it's safe to say you would

Page 22

have it on; correct?
A. It would be attached to my bulletproof vest, yes.
Q. What was your first observation of Mr. Acerra's demeanor?
A. I do not recall that encounter.
Q. Do you remember who the other officers assigned to Porta were with you?
A. I do not.
Q. Do you have any recollection of Mr. Acerra exiting from the bar?
A. I do not.
Q. Do you have any recollection of whether he left voluntarily or whether he was escorted out by security?
A. I do not recall.
Q. Do you remember Mr. Acerra acting intoxicated and making threats?
A. I do not recall.
Q. Do you remember yourself or any other officer telling Mr. Acerra to leave the property?
A. I do not recall.
Q. Did you have any conversations with Mr. Acerra on the night in question?
A. I do not recall.

Page 23

Q. Do you remember what a Use of Force Report is?
A. Yes.
Q. Could you just explain what that is, please?
A. Use of Force Report is a piece of paperwork that you fill out after an incident that required force.
Q. So earlier you described different types of force. Is a Use of Force Report required when any type of force is used?
A. Yes.
Q. So even constructive force that may be just verbal, would a Use of Force Report be needed to be filed after that?
A. I do not recall.
Q. Okay. Do you remember if you filed a Use of Force Report after this incident?
A. I do not recall.
Q. Do you remember if any force was used during this incident?
A. I do not recall.
Q. Okay. I'm going to share my screen again, so just bear with me.
MR. FITZSIMMONS: And this is the same

Page 24

exhibit two that was shown in the earlier records.
MR. SEIJAS: And, again, for the record, it's Bates stamped 257 and 258, I think; right?
MR. FITZSIMMONS: Yes. Correct.
MR. SEIJAS: Okay. Thank you.
Q. Can you see the memo, sir?
A. Yes.
Q. And it says, from SLEO II Thomas Dowling. Can you see that?
A. Yes.
Q. Can you explain what SLEO stands for?
A. Special law enforcement officer.
Q. Now, I don't see any sort of signature from you on this report. Do you remember writing this report?
A. Yes.
Q. So it's accurate to say that this is your report?
A. Yes.
Q. Okay. If you -- I'm going to scroll down and I'm going to read the last sentence of this paragraph which you wrote. It says, Acerra began to start a brief struggle with officers which led to some force being used against him to arrest Acerra and the struggle fell into the street on the

pavement.
Okay. While you're working as a police officer is it safe to say that you accurately drafted your reports?
A. Yes.
Q. After hearing this section of your report, does it refresh your recollection in terms of what happened that night?
A. No.
Q. And you stated that some force was being used against Mr. Acerra. Do you remember if you were the person that provided that force?
A. I do not.
Q. Do you remember what individual police officer provided the force?
A. No, I do not.
Q. Were you disciplined as a result of this incident?
A. I do not recall.
Q. You testified earlier that the body camera is to be activated when force is used; is that correct?
A. The camera should be activated towards any individual -- any contact with an individual whether an arrest occurs or not.



Q. And in your report you stated that some force was used; is that correct?
A. Yes.
Q. So if you had a body camera on the date in question, it's safe to say you would have activated it?
MR. SEIJAS: Object to the form of the question.
You can answer.
A. Yes.
Q. Do you have any recollection if there were other police officers there with body cameras?
A. I do not recall.
Q. Are you aware that Officer Thomas was given a verbal reprimand for failing to activate his body worn camera?
A. I do not recall.
Q. Did you stay at Porta the entire night or did you go to a different location?
A. My shift started and ended and Porta.
Q. Did you transport Mr. Acerra back to police headquarters?
A. I do not recall.
Q. Do you remember which officers or officer did escort Mr. Acerra back to headquarters?



A. I do not recall.
Q. Do you remember any police officer informing Mr. Acerra that he was under arrest?
A. I do not.
Q. This may be a difficult question to answer, but are individuals usually told they're under arrest before or after they're handcuffed?
MR. SEIJAS: Object to the form of the question.
You can answer.
A. Before. Usually before. Because the incident has arose to the point where they are being under arrest and they are verbally told that they're under arrest.
Q. Do you remember if Mr. Acerra was acting belligerent?
A. I do not recall.
Q. Do you remember if Mr. Acerra took a belated aggressive stance toward any officers?
A. I do not recall.
Q. Did you use any force on Mr. Acerra?
A. I do not recall.
Q. If you had used force on Mr. Acerra, would you have included it in your report?
A. Yes.



Q. Do you know why a Use of Force Report was not filed in this case?
A. I do not.
Q. Is it unusual for a Use of Force Report to not be filed after force was used?
MR. SEIJAS: Object to the form of the question.
You can answer.
A. Can you repeat the question, please?
Q. Sure. I'll rephrase it. If force is used in an incident to effect an arrest, is a Use of Force Report always completed?
A. Yes.
Q. Do you remember if Mr. Acerra resisted at any time during his arrest?
A. I do not.
Q. Do you remember how long this incident lasted?
A. I do not.
Q. How many other officers were working with you that night outside of Porta?
A. I do not recall.
Q. On a normal off-duty assignment could you approximate how many police officers were there?
A. I'm not sure how many officers are

# Exhibit I

Page 9

A. Verbal.
Q. How would you define reasonable force?
A. Enough force to complete the law enforcement objective.
Q. At the police academy were you taught what excessive force is?
A. Yes.
Q. How would you define excessive force?
A. More force than you need to complete the law enforcement objective.
Q. Okay. Did they teach you that a police officer has a duty to intervene if they observe another police officer using excessive force?
A. Yes.
Q. Would you agree that if an officer did use excessive force it would violate the individual's Civil rights?
MR. SEIJAS: Object to the form.
You can answer.
A. I am not familiar with the Civil Rights, but I abide by the policies of the Asbury Park Police Department.
Q. Okay. As an Asbury Park police officer have you had any complaints against you?
A. Just in general?

Page 10

MR. SEIJAS: Let me just object to the form.
You can answer, go ahead.
A. In general or --
Q. Yes.
A. Yes.
Q. Okay. Do you know how many complaints?
A. No.
Q. Do you have any idea what these complaints were for?
A. I could probably name a few.
Q. Have you had any complaints for excessive force?
A. No.
Q. Okay. Were any complaints made against you sustained?
MR. SEIJAS: Objection to the form.
You can answer.
A. One.
Q. And what was that complaint for?
A. It was ringing somebody's doorbell too many times.
Q. Not exactly excessive force.
A. No.
Q. Other than the --

Page 11

A. No complaints --
Q. Sorry. Go ahead.
A. No complaints force related.
Q. Okay. Other than this case, have you ever been sued as an Asbury Park police officer?
A. No.
Q. Are you familiar with the body camera policy in the Asbury Park Police Department?
A. Yes.
Q. To your knowledge, when did the Asbury Park Police Department start using body cameras?
A. Prior to me being a Class II there.
Q. So since you've been at Asbury Park Police Department, the body camera policy has been in effect?
A. Yes, from a patrolman. When I was a Class II, Class IIs were not required to wear body cameras.
Q. Are you familiar with the department's procedures for body worn cameras?
A. Somewhat.
Q. To your knowledge, is every police officer -- full-time police officer at Asbury Park Police Department given their own body camera?
A. Yes.

Page 12

Q. On the night of this incident, so November 23rd, 2017, were you wearing a body worn camera?
A. No.
Q. Why not?
A. Because I was a Class II police officer and we were not assigned them.
Q. When did you get hired full-time?
A. September of 2018.
Q. On the night of the incident were you on an off-duty employment shift at Porta?
A. Yes.
Q. Do you receive any sort of extra training for off-duty employment?
A. No.
Q. Okay. Before the night of the incident had you ever worked at Porta?
A. Yes.
Q. Could you approximate how many times?
A. Approximately half a dozen.
Q. Okay. When you would work an off-duty shift at Porta or other places would you go straight to the location or would you go to the Asbury Park Police Department first?
A. I go to the department first to retrieve

safe to do so, is what you're telling me?
A. Or possible. By "feasible," I mean "possible."
Q. Okay. Who were the other officers assigned to Porta that night with you?
A. The only way I remember is because of this whole situation with the attorneys and that would be Vasta and Dowling.
Q. And could you please say their first names as well, please?
A. Luke Vasta and Thomas Dowling.
Q. And prior to the night of the incident had you ever worked at Porta with these officers before?
A. I can't recall.
Q. Okay. Where were you stationed outside of Porta?
A. I believe I was leaning against my police car in the street.
Q. My understanding of Porta is there's an entrance for the bar and there's an entrance to the restaurant. Which one were you closer to?
A. I believe everybody goes in the same door when it's nightclub hours.
Q. So you were by the nightclub door?



A. Yeah. There was a wooden fence with a gate.
Q. Okay. In relation to Mr. Acerra, how far away were you when you first observed him?
MR. SEIJAS: Object to the form of the question.
You can answer.
A. I don't remember what he looks like and I don't remember the situation.
Q. Okay. So you don't remember your first impression of Mr. Acerra?
A. No. If my life depended on it I couldn't tell you what he looks like.
Q. Okay. Do you remember his exit from the bar at all?
A. No.
Q. So you have no memory of whether security or bouncers put their hands on him to remove him from the bar?
A. No.
Q. Do you know why Mr. Acerra was ejected from the bar?
A. Only based off of the reports that I've been given.
Q. After he exited the bar do you remember



Mr. Acerra saying anything?
A. I don't remember the incident.
Q. Do you remember you yourself or other officers telling Mr. Acerra to leave the property?
A. No.
Q. No. Do you remember any sort of conversation had with Mr. Acerra?
A. No. As I stated, I don't even remember him.
Q. Okay. Are you aware that in his deposition Officer Richard Thomas testified that officers were pleading with Mr. Acerra for eight to five minutes prior to his arrest?
A. I was not made aware of his report that he wrote.
Q. Do you remember anything about Mr. Acerra whatsoever?
A. No.
Q. While working special employment at Porta did you ever have to use constructive authority in any fashion?
A. Yes.
Q. Could you provide some examples of that, please?
A. Pardon me. To instruct a person to



leave the premises or to calm down and stop creating a scene or disturbance.
Q. So you would agree that telling an individual to leave the property would be a use of constructive authority?
A. Yes and no.
Q. Why no?
A. Because when we work the bars we don't want to get anybody in trouble. We don't want to have to arrest anybody. We want to try to help people to their cars because we understand -- or their taxis or their Ubers because we understand that they're intoxicated and we don't want to ruin their night. And --
Q. Okay.
A. -- we also don't want to make the club look bad.
Q. I understand that. But what does that have to do with whether a command is considered constructive authority or not?
A. It could be just, like, saying as a friend or a man-to-man type of -- constructive authority isn't necessarily yelling at somebody. It could be, Hey, man, let's go this way, you know, c'mon, c'mon. Let's go, c'mon. It's almost a