<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| THOMAS H. ACERRA, JR.,<br><br>Plaintiff,<br><br>v.<br><br>RICHARD THOMAS, et al.,<br><br>Defendants. | Civil Action No. 19-19933 (GC) (TJB)<br><br>**MEMORANDUM OPINION** |

<u>**CASTNER, United States District Judge**</u>

This matter comes before the Court on Defendants City of Asbury Park; Police Officers Richard Thomas, Thomas Dowling, Luke Vasta, and Sam Griffeth; and Deputy Chief of Police David Kelso's motion for summary judgment on Plaintiff Thomas H. Acerra, Jr.'s complaint, under Federal Rule of Civil Procedure (Rule) 56.  (ECF Nos. 22, 45.)  Acerra opposed, and Defendants replied.  (ECF Nos. 49, 50.)  The Court carefully considered the parties' submissions and decides the motion without oral argument pursuant to Rule 78(b) and Local Civil Rule 78.1(b). For the reasons set forth below, and other good cause shown, Defendants' motion is **GRANTED** in part and **DENIED** in part.

I.      <u>**BACKGROUND**</u>

    **A.      Procedural Background**

Plaintiff Thomas H. Acerra, Jr., sues Defendants Asbury Park; Police Officers Richard Thomas, Thomas Dowling, Luke Vasta, and Sam Griffeth; and Deputy Chief of Police David Kelso.  Acerra alleges that he endured excessive and unreasonable force when police officers, without warning or provocation, slammed him to the ground and rammed their knees into his back

while they handcuffed him, causing him to sustain a concussion and wrist and hand injuries.  (ECF No. 22 ¶¶ 8-9.)

Acerra brings claims under 42 U.S.C. § 1983 against the police officers for use of excessive force and failure to intervene (Counts One & Two); Deputy Chief Kelso for supervisory liability (Count Three); and Asbury Park and Deputy Chief Kelso for unlawful policy, custom, and practice, and inadequate training (Count Four).  He also brings state-law claims against the police officers for violations of the New Jersey Civil Rights Act (NJCRA), N.J. Stat. Ann. § 10:6-1, *et seq.* (Count Five), and the police officers and Asbury Park for assault and battery and negligence (Counts Six & Seven).  (ECF No. 22.)[1]

After the parties completed discovery, Defendants moved for summary judgment.[2]

---

[1]    The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. § 1367.

[2]    The relevant parts of the summary judgment record are as follows:

- Defendants' Statement of Undisputed Material Facts (SMF) (ECF No. 45-2).

- Acerra's Response to Defendants' Statement of Undisputed Material Facts (RSMF) (ECF No. 49 at 4-5).

- Acerra's supplemental statement of disputed material facts (SSMF) (ECF No. 49 at 6-10).  Defendants did not respond to Acerra's supplemental statement.

- Transcript excerpts from Acerra's deposition (ECF No. 45-4 at 17-62; ECF No. 49-1 at 1-3); Cassandra Acerra's deposition (ECF No. 45-4 at 64-78; ECF No. 49-1 at 4-5); Richard Thomas's deposition (ECF No. 45-4 at 79-116; ECF No. 49-3 at 1-4); Luke Vasta's deposition (ECF No. 49-3 at 8-11); Thomas Dowling's deposition (ECF No. 49-3 at 12-15); and Samual Griffeth's deposition (ECF No. 49-3 at 16-18).

- Asbury Park Police Department's Use of Force Policy (Seijas Cert. Ex. A, ECF No. 50-1).

Page numbers for record cites (i.e., "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

### B.      The Incident

On November 23, 2017, Acerra and his sister, Cassandra, spent Thanksgiving Eve at Porta Restaurant in Asbury Park, New Jersey.  When they were ready to leave, they stepped outside to order an Uber.[3]  The weather was cold, and Acerra did not have a jacket.  When he tried to escape the cold and reenter the restaurant to wait for his ride, Porta's bouncer denied his reentry.  At first, Acerra tried to reason with the bouncer, explaining that he paid the cover charge.  But the bouncer stood firm, and Acerra grew colder and more frustrated.  "I wouldn't say [I was] loud, but I definitely raised my voice after a little bit," Acerra recalled during his deposition.  (SMF & RSMF ¶¶ 1-6; Pl. Dep. 114:6-15.)

Meanwhile, Asbury Park Police Officers Richard Thomas, Thomas Dowling, Luke Vasta and Sam Griffeth stood nearby watching Acerra try to talk his way back inside.  (SMF & RSMF ¶ 7.)  The parties disagree about what followed between the police officers and Acerra.

Acerra testified that one police officer told him to "[g]et off the sidewalk."  Acerra says he complied and stepped into the street.  Then, Acerra says, he stepped back onto the sidewalk to stand with his sister as they waited for the Uber.  That's when Acerra heard someone say, "[T]hat's it, your night's over," before Acerra was apprehended from behind, slammed facedown into the pavement, and handcuffed.  The encounter "happened so fast," and Acerra could not see who slammed him or how many police officers restrained him.  Nor could he recall whether he felt arms around him before he went to the ground.  But Acerra testified that it felt as though multiple police officers were on top of him, with a forearm at his neck and knee in his back.  He also recalled that two other officers held his arms as they handcuffed him.  Acerra estimates that the incident

---

[3]      Acerra testified that he and his sister voluntarily left Porta.  (Pl. Dep. 108:16-109:8.)

lasted two or three minutes.  (Pl. Dep. 97:12-101:22, 103:3-7, 106:12-14; SMF & RSMF ¶¶ 9-10; SSMF ¶ 2.)

Acerra's sister, who was tracking the Uber on her cellphone, testified that she looked up from her cellphone just as Acerra was "midway being thrown" to the ground by a police officer. (C. Acerra Dep. 23:2-8, 26:3-8; SMF & RSMF ¶ 11; SSMF ¶¶ 3-4.)

Officer Thomas, the police officer who allegedly slammed Acerra, told a different version of the incident.  Thomas testified that Acerra was belligerent as police officers pleaded with him for several minutes to leave the area.  Acerra refused.  Eventually, Thomas sensed from Acerra's body language that "he was getting ready to fight us."  So Thomas grabbed Acerra's wrist, prompting Acerra to pull back sharply.  In doing so, Acerra lost his footing and fell backwards, dragging down with him Thomas, who kept control of Acerra's wrist.  Thomas recalls landing on top of Acerra "chest to chest."  Thomas then rolled Acerra over and, with Officers Vasta and Griffeth's help, handcuffed Acerra behind his back.  Thomas denies using his knees at all.  Only when they both fell to the ground did Thomas tell Acerra that he was under arrest.  Thomas was not wearing his body worn camera; it was charging in the patrol vehicle.  (Thomas Dep. 81:6-9, 86:20-22, 87:18-23; *see also* ECF No. 49-3 at 6-7 (Thomas's 3/26/2018 written statement as part of an internal affairs investigation).)

At his deposition, Thomas made clear that Acerra did not pull him; Thomas fell because he did not let go of Acerra's wrist.  Thomas also testified that Acerra "was completely compliant once [he and Thomas] hit the ground."  Acerra did not struggle, fight, or resist arrest.  (Thomas Dep. 84:18-25, 86:1-19, 87:25-88:15.)

Acerra was arrested and transported to the Asbury Park Police Department.  Acerra never asked for medical assistance while at the scene, in the police car, or at the police station.  Acerra

was charged with Disorderly Conduct under N.J. Stat. Ann. § 2C:33-2A(1), though he ultimately pled guilty to an amended charge under a municipal ordinance.  (SMF & RSMF ¶¶ 14-17.)

Special Law Enforcement Officer Thomas Dowling prepared a report in which he stated that "Acerra began to start a brief struggle with officers which led to some force being used against him to arrest Acerra and the struggle fell into the street on the pavement."  At his deposition, Dowling could not recall many details of the incident, even when presented with his written statement.  Though, Dowling testified that if he had used force on Acerra, he would have said so in his report.  He also testified that if he had a body worn camera when Acerra was arrested, he would have activated it as necessary upon making "any contact with an individual whether an arrest occurs or not."  (Dowling Dep. 24:8-25:9, 25:20-26:10, 27:23-25.)

Officer Vasta also could not recall much of the incident.  Still, he testified that in his experience, if an individual disobeyed his command to leave the premises, he would give the individual "one more option to leave," and "[i]f they did not leave[,] they would be arrested."  If the individual disobeyed multiple commands to leave, Vasta would activate his body worn camera to record the encounter, unless action had to be taken "quickly and effectively."  When presented with Dowling's written statement noted above, Vasta testified that he trusted the statement's accuracy, though he could not independently verify it.  (Vasta Dep. 17:15-18:7, 21:6-21, 22:10-24:6.)

Officer Griffeth could not recall the incident with Acerra at all.  When Acerra was arrested, Griffeth was a Class II police officer, who is not assigned a body worn camera.  (Griffeth Dep. 12:1-7, 18:3-19:18.)

## II.   <u>LEGAL STANDARD</u>

"Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure." *In re Lemington Home for Aged*, 659 F.3d 282, 290 (3d Cir. 2011).  Pursuant to Rule 56, "[s]ummary judgment is proper when, viewing the evidence in the light most favorable to the nonmoving party and drawing all inferences in favor of that party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (citing Fed. R. Civ. P. 56(a)).  "A fact is material if—taken as true—it would affect the outcome of the case under governing law." *M.S. by & through Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 125 (3d Cir. 2020) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "And a factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.*

## III.   <u>DISCUSSION</u>

Defendants argue that qualified immunity bars Acerra's § 1983 and NJCRA claims for excessive force (Counts One, Two, Three, and Five) for two reasons: *first*, the police officers used force that was objectively reasonable and thus did not violate a constitutional right; and *second*, even if the force violated a constitutional right, it did not violate a clearly established right.  (ECF No. 45-1 at 13-20.)  As for Acerra's common-law tort claims for assault and battery and negligence (Counts Six and Seven), Defendants argue that those claims fail for the same reasons that Acerra's excessive force claims fail, and because they are barred by the immunities and conditions of the New Jersey Tort Claims Act (NJTCA).  (*Id.* at 17, 25-32 n.1.)[4]

---

[4]     Defendants also argue that Acerra's § 1983 claim for maintaining unlawful policies, customs, and practices and inadequate training (Count Four) fails because Acerra provides no proof of an official policy of inadequate training that caused a deprivation of his rights.  (ECF No. 45-1 at 20-24.)  Acerra, however, "does not oppose granting summary judgment to Defendants on [his] Supervisory Liability and *Monell* claims," which are found under Counts Three and Four.

### A.       Qualified Immunity

"Qualified immunity protects government officials from being held liable for damages when their conduct does not violate a citizen's clearly established rights.  As the Supreme Court has noted, qualified immunity advances a policy of 'shield[ing] officials from harassment, distraction, and liability when they perform their duties reasonably.'"  *James v. New Jersey State Police*, 957 F.3d 165, 166 (3d Cir. 2020) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "When properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law."  *Taylor v. Barkes*, 575 U.S. 822, 825 (2015) (citations omitted).

A qualified immunity analysis entails a two-prong inquiry: *first*, "whether the facts that a plaintiff has . . . shown make out a violation of a constitutional right," and *second*, "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct."  *James*, 957 F.3d at 168 (quoting *Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 637 (3d Cir. 2015)).  "The officers bear the burden of persuasion under each prong."  *Anglemeyer v. Ammons*, 92 F.4th 184, 188 (3d Cir. 2024).

"To determine whether a right was 'clearly established,'" courts must "define the right allegedly violated at the appropriate level of specificity," asking "whether the right was 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  *Peroza-Benitez v. Smith*, 994 F.3d 157, 165 (3d Cir. 2021) (citations omitted).  To complete this inquiry, courts "first look to factually analogous precedents of the Supreme Court and the Third Circuit.  Then, [they] examine persuasive authorities, such as . . . nonprecedential opinions and decisions from other Courts of Appeals.  [Courts] may consider all relevant cases

_____

(ECF No. 49 at 15.)  Accordingly, the Court enters summary judgment in Defendants' favor on those claims.

under this inquiry, not just those cited by the parties." *James*, 957 F.3d at 170. "[I]n some exceptional cases[,] the 'violation [is] obvious' such that general statements of law may suffice to show that a right is 'clearly established,' even in the absence of factually analogous precedent." *Peroza-Benitez*, 994 F.3d at 166 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)). For example, "[i]n the excessive force context, an 'obvious' case is one where the general statements of law articulated in *Graham v. Connor*, 490 U.S. 386 (1989), and *Tennessee v. Garner*, 471 U.S. 1 (1985), provide the requisite notice." *Id.*

1.   First Prong: Violation of Constitutional Right

"The right to be free from the use of excessive force has been recognized under the Fourth Amendment, which guarantees the right of citizens 'to be secure in their persons . . . against unreasonable . . . seizures.'" *Anglemeyer*, 92 F.4th at 188 (quoting *Graham*, 490 U.S. at 394).

"The question in excessive force cases is whether, under the totality of the circumstances, 'the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Id.* (quoting *Graham*, 490 U.S. at 397). Courts "analyze this question 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Id.* (quoting *Graham*, 490 U.S. at 396). And courts "make 'allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Id.* (quoting *Graham*, 490 U.S. at 398).

When assessing whether an officers' actions are objectively reasonable, courts consider (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," (3) "whether he is actively resisting arrest or attempting to evade arrest by flight," (4) "the physical injury to the plaintiff," (5) "the possibility that the persons subject to

the police action are themselves violent or dangerous," (6) "the duration of the action," (7) "whether the action takes place in the context of effecting an arrest," (8) "the possibility that the suspect may be armed," and (9) "the number of persons with whom the police officers must contend at one time." *Id.* (quoting *Graham*, 490 U.S. at 396; *El v. City of Pittsburgh*, 975 F.3d 327, 336 (3d Cir. 2020)).

At summary judgment, the facts must be viewed "in the light most favorable to . . . the non-moving party"—here, Acerra. *Peroza-Benitez*, 994 F.3d at 166-67. And a district court must "analyze separately, and state findings with respect to, the specific conduct of each [defendant]."[5] *Williams v. City of York, Pennsylvania*, 967 F.3d 252, 255 (3d Cir. 2020) (quoting *Grant v. City of Pittsburgh*, 98 F.3d 116, 126 (3d Cir. 1996)). When one party's narrative of events is "blatantly contradicted by the record," including by video footage, "a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Ringgold v. Keller*, 608 F. App'x 102, 104 (3d Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)); *see also Castellani v. City of Atl. City*, Civ. No. 13-5848, 2017 WL 3112820, at *8 (D.N.J. July 21, 2017).

Here, Acerra's and Thomas's testimony about the incident diverge. According to Thomas, he and Acerra ended up on the ground by accident; Acerra was not brought to the ground by police officers. Thomas reported, and later testified, that he grabbed Acerra's wrist because he sensed that Acerra was preparing to fight him. As a result, Acerra lost his footing and fell, which caused Thomas, who kept control of Acerra's wrist, to fall too. (ECF No. 49-3 at 6.)[6] In contrast, Acerra

---

[5]   That said, Defendants assert qualified immunity as to all Defendants collectively; they do not analyze the defense for any one defendant based on that defendant's specific conduct.

[6]   Defendants also contend, however, that "[Acerra] was brought to the ground by the Defendant Officers" because "[Acerra] did not comply with a Police Officer's command to get off the sidewalk." (ECF No. 50 at 4-5.)

testified that he stepped onto the sidewalk from the street before being suddenly and unexpectedly apprehended from behind, thrown to the ground, held down by an officer's knee, and handcuffed. Acerra claims that he did not see or feel the police officer coming.  Nor did the officer tell Acerra "not to hang out in front of Porta" or that he was under arrest.  Acerra only heard the officer tell him to stay off the sidewalk and, immediately before taking Acerra to the ground, "[T]hat's it, your night's over."  (Pl. Dep. 106:12-107:6.)  Acerra's sister's testimony that she witnessed "[Acerra] midway being thrown to the ground" aligns with Acerra's version of the incident.  (C. Acerra Dep. 26:3-8.)

The record does not include evidence that blatantly contradicts or could independently verify either side's version, such as video footage.  Indeed, when Thomas arrested Acerra, he was not wearing his body worn camera, and none of the other officers' body worn cameras captured the incident.  Absent such blatantly contradictory or independent evidence, the Court must accept Acerra's version—that when Acerra stepped onto the sidewalk from the street, Thomas suddenly and unexpectedly apprehended him from behind, threw him to the ground, and handcuffed him. *See Anglemeyer*, 92 F.4th at 189 (finding that the district court committed reversible error when it "predominantly credited the officers' version of events" and "failed to construe the evidence in favor of each plaintiff"); *Peroza-Benitez*, 994 F.3d at 169 ("C.I. Haser moved for summary judgment on the grounds of qualified immunity, thus we *must* view the facts in the light most favorable to the non-moving party, *i.e.*, Peroza-Benitez.").

Accepting Acerra's version of the incident, the Court next assesses whether Thomas's actions were objectively reasonable.

Acerra was initially charged with disorderly conduct, though he claims that he was not confrontational with the police officers and did not resist arrest.  He also claims that he was not

facing the police officers when he stepped onto the sidewalk in disregard for their command to stay off the sidewalk. Acerra alleges that when he was apprehended from behind, he was attempting to leave the area and wait with his sister for an Uber.

Accepting Acerra's version as true, a jury could find that the officers' actions were not objectively reasonable. Acerra did not pose an immediate threat to the officers; he was neither resisting arrest nor trying to flee; he was not violent or dangerous; the situation unfolded over several minutes, "not a few tense and dangerous seconds," *El*, 975 F.3d at 337; and he was unarmed (law enforcement officers do not claim that they believed that Acerra was armed). And according to both sides, Acerra did not know that he was under arrest until Thomas and Acerra were on the ground, when Thomas first informed Acerra that he was under arrest. All told, a factfinder could reasonably conclude that the act of throwing Acerra to the ground without warning or provocation other than Acerra's noncompliance with an order to stay off the sidewalk, if proven to be true, was unconstitutionally excessive force. *See Couden v. Duffy*, 446 F.3d 483, 497 (3d Cir. 2006) (finding unconstitutional excessive force where officers tackled plaintiff in his own home, even though plaintiff was unarmed, cooperative, and not resisting arrest or attempting to flee).

Defendants argue that the force used on Acerra was objectively reasonable to effect a lawful arrest, according to the Asbury Park Police Department Use of Force Policy in place when Acerra was arrested. (ECF No. 50 at 4-7.) The Use of Force Policy authorized arresting-officers to use "physical force," defined as "contact with a subject beyond that which is generally utilized to effect an arrest or other law enforcement objective," when "necessary to overcome a subject's physical resistance to the exertion of an officer's authority or to protect persons or property" and when the officers "reasonably believe that the use of force is immediately necessary." (Use of Force Policy §§ I.A.3, II.A.1.f.) "Reasonable belief," the Policy states, "is an objective assessment

based upon an evaluation of how a reasonable police officer with comparable training and experience would react to, or draw inferences from, the facts and circumstances confronting and known by the officer at the scene." (Use of Force Policy § I.H.)

Defendants highlight one situation in which the Policy expressly permits physical force: "To effectuate the lawful arrest of any person for an offense or crime under the laws of the State of New Jersey." (ECF No. 50 at 6 (quoting Use of Force Policy § II.A.1.f).) The Policy continues as follows:

> The use of less lethal force to effectuate an arrest however is not justifiable unless[:]
>
> 1) The arrest is lawful, and the officers make known the purpose of the arrest or reasonably believe that their identity and purpose are otherwise known by or cannot reasonably be made known to the person to be arrested, and;
>
> 2) When the arrest is made under a warrant and the warrant is valid or reasonably believed by the officer to be valid.
>
> [(Use of Force Policy § II.A.1.f.)]

But the Policy does not permit an officer to use any amount of physical force when effectuating a lawful arrest, contrary to what Defendants imply. In fact, the Policy states that "officers will use only that force that is objectively reasonable when force is necessary to accomplish lawful objectives." (Use of Force Policy p.1.) The challenge for Defendants is that their argument requires the Court to accept Thomas's version of the incident and reject Acerra's. Under the summary judgment standard, however, the Court cannot do so. Again, given that Acerra's and Thomas's version of the incident diverge, and the record does not include evidence that independently resolves the dispute, the summary judgment standard requires the Court to accept Acerra's version of the facts.

12

According to Acerra, Thomas did not "make known the purpose of the arrest" before he apprehended Acerra from behind. Nor could Thomas, by Acerra's account, "reasonably believe that [his] identity and purpose" were otherwise known to Acerra, since Acerra testified to being suddenly and unexpectedly apprehended from behind. And Thomas so apprehended Acerra only because, as Defendants assert, Acerra "did not comply with a Police Officer's command to get off the sidewalk." (ECF No. 50 at 5.)

Thus, material disputes of fact exist such that a jury could find that the force used on Acerra was objectively unreasonable. The Court turns to the second prong.

### 2.   Second Prong: Clearly Established Constitutional Right

The Court next decides whether Defendants have met their burden of showing that "reasonable officers could not have known that their actions violated clearly established law." *Anglemeyer*, 92 F.4th at 191 (quoting *Mack v. Yost*, 63 F.4th 211, 228 (3d Cir. 2023)). In doing so, the Court starts "by defining the right allegedly violated with a 'high degree of specificity,'" and then asks "whether that right was clearly established at the time of its alleged violation." *Id.* (quoting *D.C. v. Wesby*, 583 U.S. 48, 63 (2018); then *Mack*, 63 F.4th at 228).

The Court defines the allegedly violated right as follows: the Fourth Amendment right of an unarmed, nonviolent individual, who is not under, resisting, or fleeing arrest or suspected of a serious crime, to be free from being thrown to the ground from behind, without warning, for disobeying a police officer's command to stay off a sidewalk.[7]

---

[7]     Critical here, the Court defines this right based on Acerra's version of the incident, which the Court must accept for purposes of summary judgment. If a jury rejects Acerra's version, Defendants might be entitled to qualified immunity as a matter of law. *See Carswell v. Borough of Homestead*, 381 F.3d 235, 242 (3d Cir. 2004) ("The jury . . . determines disputed historical facts material to the qualified immunity question. District Courts may use special interrogatories to allow juries to perform this function. The court must make the ultimate determination on the availability of qualified immunity as a matter of law." (internal citations omitted)).

That right was clearly established at the time of the incident.  *See El*, 975 F.3d at 340-41 (collecting pre-2017 cases demonstrating a "consensus of persuasive authority" that "an unarmed individual who is not suspected of a serious crime—including one who is verbally uncooperative or passively resists the police—has the right not to be subjected to physical force such as being grabbed, dragged, or taken down" or "slammed"); *Pratt v. Port Auth. of New York & New Jersey*, 563 F. App'x 132, 135 (3d Cir. 2014) (holding that force was excessive where the plaintiff "did not resist [the police officer] in any way, was unarmed, and had committed, if anything, a relatively minor offense, yet [the officer] tackled him, face-first, onto the ground, twisting his neck on the way down, and causing him serious and permanent spinal injuries"); *Faragalla v. Jersey City*, Civ. No. 17-3604, 2020 WL 5812798, at *8 (D.N.J. Sept. 30, 2020) (collecting pre-2017 cases from other circuits holding that tackling unarmed and non-dangerous suspects constitutes excessive force).

Critical disputes of fact prevent the Court from finding that the police officers have satisfied their burden of proving the defense of qualified immunity as to Acerra's excessive force claims under Counts One, Two, Three, and Five.  *See Curley v. Klem*, 298 F.3d 271, 278 (3d Cir. 2002) ("Just as the granting of summary judgment is inappropriate when a genuine issue exists as to any material fact, a decision on qualified immunity will be premature when there are unresolved disputes of historical fact relevant to the immunity analysis.").  Accordingly, Defendants' motion for summary judgment on qualified immunity grounds is denied without prejudice to their renewing the defense at trial.[8]

---

[8]      Though Acerra also defends the merits of his failure to intervene claim, Defendants attack that claim only on qualified immunity grounds.  So the Court need not address Acerra's failure to intervene claim separately.

### B.      Tort Claims

Defendants argue that they are entitled to qualified good-faith immunity under the NJTCA on Acerra's common-law tort claims for assault and battery and negligence (Counts Six and Seven).  (ECF No. 45-1 at 25-32.)

The NJTCA immunizes public employees from liability for actions taken "in good faith in the execution or enforcement of any law."  N.J. Stat. Ann. § 59:3-3.  Immunity attaches if the employee shows either "objective reasonableness" or "subjective good faith."  *Alston v. City of Camden*, 73 A.2d 693, 703 (N.J. 2001).  "The same 'objective reasonableness' standard that is used to determine whether a defendant enjoys qualified immunity from actions brought pursuant to 42 U.S.C. § 1983 is used to determine questions of good faith arising under N.J.S.A. § 59:3-3."  *Mantz v. Chain*, 239 F. Supp. 2d 486, 508 (D.N.J. 2002) (citing *Lear v. Twp. of Piscataway*, 566 A.2d 557, 558 (N.J. Super. Ct. App. Div. 1989)); *see Roccisano v. Twp. of Franklin*, Civ. No. 11-6558, 2013 WL 3654101, at *7 n.6 (D.N.J. July 12, 2013) (noting that the court's reasons for rejecting qualified immunity on excessive force claims would also apply to its analysis of good-faith immunity under § 59:3-3 on a negligence claim).  "The subjective component refers to 'permissible intentions.'"  *Alston*, 773 A.2d at 703 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982)).

As with Acerra's § 1983 claims, critical disputes of fact concerning the objective and subjective reasonableness of Defendants' conduct prevent the Court from applying § 59:3-3 immunity at this stage.  The Court therefore rejects Defendants' argument without prejudice to their right to renew it after the disputed issues are resolved.  *See Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 445 (D.N.J. 2011) (refraining from applying § 59:3-3 immunity pending the

resolution of disputed issues of fact regarding the reasonableness of the defendant's conduct);

*Mantz*, 239 F. Supp. 2d at 507-08 (same).  Acerra's common-law tort claims may proceed.

## IV.   <u>CONCLUSION</u>

For the reasons set forth above, Defendants' motion for summary judgment is **GRANTED** in part and **DENIED** in part.  An appropriate Order follows.

Dated: June 27, 2024

G<small>EORGETTE</small> C<small>ASTNER</small>
U<small>NITED</small> S<small>TATES</small> D<small>ISTRICT</small> J<small>UDGE</small>

16